**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 22-21397-CV-WILLIAMS**

JAFET CASTRO-REYES,

      Plaintiff,

v.

CITY OF OPA-LOCKA, *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER

**THIS MATTER** is before the Court on Defendant City of Opa-Locka's ("*City*") Motion for Summary Judgment (DE 99); Defendants German Bosque ("*Bosque*") and Daniel Kelly's ("*Kelly*") Motion for Summary Judgment (DE 100); Defendant Luis Serrano's ("*Serrano*") Motion for Summary Judgment (DE 103); Defendant Sergio Perez's ("*Perez*" or together with Bosque, Kelly, and Serrano, the "*Defendant Officers*"[1]) Motion for Summary Judgment (DE 108); and the Partial Motion for Summary Judgment filed by Plaintiff Jafet Castro-Reyes ("*Plaintiff*" or "*Mr. Castro-Reyes*") (DE 109) (collectively, "*Motions*"). The Motions are fully briefed and ripe for review. The Court has reviewed the Motions, the accompanying Statements of Material Facts (DE 98; DE 104; DE 106; DE 111), the briefing, and the record. Due to the similarities in issues and claims presented in the Motions, the Court resolves all Motions in this Omnibus Order.

---

[1] The individual defendants were all City of Opa-Locka police officers on the day of the incident. (DE 111 ¶ 83.)

For the reasons set forth below, Plaintiff's Motion for Summary Judgment (DE 109) is **DENIED**, and Defendants' Motions for Summary Judgment (DE 99; DE 100; DE 103; DE 108) are **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND

On the morning of September 21, 2020, Mr. Castro-Reyes, a teenager living alone in an apartment at 2544 York Street in Opa-Locka, told his cousin who lived next door, Pamela Betancourth, that he wanted to move and begin a new life. (DE 106 ¶ 1; DE 107-11 at 9:22–25, 25:7–8; DE 129 ¶ 1.) Later the same day, Missael Perez, Mr. Castro-Reyes' childhood friend who lived in an apartment complex nearby, observed Mr. Castro-Reyes behaving "a bit hyperactive[ly]" from across the street. (DE 88-1 at 14:20–16:22.) Mr. Perez watched Mr. Castro-Reyes move all the furniture from inside his apartment to the lawn because he was trying to "cleanse his life." (DE 98 ¶ 18.) Mr. Perez called Mr. Castro-Reyes' cousin and aunt, Jose Varela and Rina Ayala, and Ms. Betancourth to check on him. (DE 88-1 at 20:4–6.)

At around 1:00 PM or 2:00 PM, Mr. Varela and Ms. Ayala arrived. (DE 107-8 at 21:1–4; DE 107-9 at 26:19–20.) Mr. Varela observed Mr. Castro-Reyes crying, walking around the living room, and saying he felt bad. (DE 107-8 at 55:12–19.) Mr. Castro-Reyes told his family members that he wanted to leave, but Ms. Ayala and Mr. Varela stood in front of the door to stop him from exiting the apartment. (DE 107-9 at 30:1–3, 32:25–36:4, 31:4.) Mr. Castro-Reyes was not aggressive towards his family at any point but he asked them to move aside. (DE 107-9 at 33:7–8.) Nonetheless, his family believed Mr. Castro-Reyes was "not well" and "unrecognizable" and Mr. Varela and Ms. Ayala continued to block the door out of concern for his safety. (DE 98 ¶¶ 15, 17, 20; DE 128 ¶ 17.) Mr.

Varela and Ms. Ayala decided to tie Mr. Castro-Reyes' hands and feet with electrical wires and cords to prevent him from leaving the apartment. (DE 107-8 at 34:7–8; DE 98 ¶ 19; DE 111 ¶ 10; DE 126 ¶ 10.)

After observing Mr. Castro-Reyes' behavior for a period of time, the family decided to call 911. (DE 107-8 at 23:19–21; DE 107-9 at 31:13–15.) Mr. Varela and Ms. Ayala hoped that fire rescue or an ambulance would come to help Mr. Castro-Reyes. (*Id.*) Mr. Varela asked Ms. Betancourth, who was not in the apartment, to call 911. (DE 107-11 at 29:17–24, 32:1–3, 56:15–19.) Ms. Betancourth called, asked for police assistance, and told the dispatcher that Mr. Castro-Reyes was acting strangely, but was not violent. (*Id.*)

### A. The Initial Responding Officers (Bosque and Kelly)

In response to the 911 call, Defendants Bosque and Kelly[2] were dispatched to 2544 York Street for a domestic issue involving a "possibly high" subject. (DE 107-17.) It is undisputed that Defendants Bosque and Kelly arrived in response to the 911 dispatch call and not pursuant to a warrant or because they suspected a crime had occurred. (DE 107-1 at 91:20–92:3.) Defendants Bosque and Kelly arrived at the scene at approximately 3:44 PM with their body-cameras activated. (DE 98 ¶ 24; DE 128 ¶ 24; DE 107-3.) Mr. Varela met Defendants Bosque and Kelly on the street outside the apartment and told them Mr. Castro-Reyes was tied up because he was acting strangely. (DE 98 ¶¶ 2, 15; DE 128 ¶¶ 2, 15.) Mr. Varela then walked with Defendants Bosque and Kelly toward the apartment door, which was open. (DE 107-3.)

---

[2] At the time, Defendant Bosque was a City of Opa-Locka Police Sergeant and Defendant Kelly was a City of Opa-Locka Police Officer. (DE 98 ¶ 1.)

When Defendants Bosque and Kelly entered the apartment, the floor was "completely wet" and Mr. Castro-Reyes lay on the ground with his hands, legs, and ankles tied with electrical wires and cords. (DE 107-1 at 23:22, 23:5, 28:6–21, 33:9–13.) Mr. Castro-Reyes immediately told Defendants Bosque and Kelly to leave the apartment and stated only God could enter. But Ms. Ayala intervened, telling Defendants Bosque and Kelly that they had permission to enter. (DE 107-3; DE 107-7 at 73:14–16.)

Within seconds of arriving, Defendants Bosque and Kelly decided to handcuff Mr. Castro-Reyes to control the scene and protect responding officers. (DE 98 ¶ 7; DE 107-3.) Defendant Bosque asked the family members to assist him in untying Mr. Castro-Reyes, and Mr. Varela began doing so. (DE 107-1 at 29:14–17; DE 107-3.) At this point, about ninety seconds from Defendants Bosque and Kelly's arrival, neither officer had come into physical contact with Mr. Castro-Reyes, who continued to lay still on the ground. (DE 107-3.) Then, Defendant Bosque instructed Mr. Castro-Reyes to turn around so he could place him in handcuffs. (*Id.*) Based on Defendant Bosque's body-camera footage and statements, it is unclear if Mr. Castro-Reyes was physically able to comply with this order. By Defendant Bosque's own admission, Mr. Castro-Reyes' hands, legs, and feet were bound, and he lay on a wet tile floor. (DE 107-1 at 23:5, 23:22, 28:6–21, 33:9–13.) Furthermore, Defendants Bosque and Kelly, as well as Mr. Castro-Reyes' family, stood around his body as Defendant Bosque repeated the instruction to turn over.

When Defendant Bosque asked his name, Mr. Castro-Reyes responded, "I am God" in Spanish but continued to lay unmoving on the floor. (DE 107-3.) At this point, Defendant Bosque declared the situation to be a Baker Act event. (DE 98 ¶ 9; DE 107-1 at 88:15–18.) Meanwhile, Mr. Varela untied one of Mr. Castro-Reyes' hands and

Defendant Kelly placed a handcuff on Mr. Castro-Reyes' wrist at about 3:46 PM, two minutes after Defendants Bosque and Kelly had arrived on scene. (DE 107-3.) Then, Defendants Bosque and Kelly attempted to physically flip Mr. Castro-Reyes over to handcuff him behind his back but were unable to do so. (DE 106 ¶ 11; DE 107-3.) Amid these attempts, Mr. Castro-Reyes again asked the responding officers to leave. (DE 98 ¶ 8; DE 107-1 at 45:9–11.) Instead, Defendant Bosque called for backup. (DE 107-3.) When requesting backup, the dispatcher incorrectly advised that the subject was a "violent male." (DE 107-17.) As they waited for backup, Mr. Varela continued trying to flip Mr. Castro-Reyes over, and Defendant Bosque held on to Mr. Castro-Reyes' unhandcuffed hand. (DE 107-3.) Unable to turn Mr. Castro-Reyes over on the slippery floor, and about five minutes after the officers originally arrived, Mr. Varela put Mr. Castro-Reyes in a chokehold so Defendants Kelly and Bosque could handcuff him. (*Id*.) Mr. Castro-Reyes continued pleading to be let go and left alone as his face turned red. (*Id*.)

### B.  The Backup Officers (Serrano and Perez)

Backup officers, including Defendants Serrano and Perez,[3] rushed into the apartment at 3:50 PM, about six minutes after Defendants Bosque and Kelly first arrived. (*Id*.) The dispatcher advised the backup officers that Mr. Castro-Reyes was potentially violent and resisting arrest. (DE 106 ¶ 27; DE 129 ¶ 27.) But they were not given the facts underlying the original request for police assistance, nor were they told that they were possibly dealing with a mentally ill individual. (*Id*.) And upon their arrival, Defendant Bosque told the backup officers that Mr. Castro-Reyes was "overpowering" them. (*Id*.)

---

[3] Defendant Serrano was an Opa-Locka Police Officer on the day of the incident and Defendant Perez was an Opa-Locka Lieutenant. Upon his arrival, Defendant Perez became the commanding officer at the scene. (DE 107-1 at 21:2–5, 42:25, 43:1–6.)

Video footage shows Mr. Castro-Reyes laying on his back, held in a chokehold by Mr. Varela, with his hands clasped together in front of his chest when the backup officers arrive. (*Id*.) The backup officers immediately removed Mr. Varela from proximity to Mr. Castro-Reyes. Mr. Varela then stood in the corner of the apartment as the ensuing events unfolded. (DE 107-3.)

An officer who is not named in this action lifted Mr. Castro-Reyes up by his hands—still clasped together—presumably to flip him over. The officer could not do so, and instead slammed Mr. Castro-Reyes back on to the floor. (*Id*.) Just two seconds later, Defendant Serrano tased Mr. Castro-Reyes for the first time. (*Id*.) As soon as the taser connected with his skin, Mr. Castro-Reyes spasmed and curled into the fetal position. (*Id*.) Multiple officers grabbed Mr. Castro-Reyes, pulling his body in various directions, and shouting at him to turn around. (*Id*.) At this moment, the body camera footage turned away from Mr. Castro-Reyes, but the continuous sound of a deployed taser can be heard. (*Id*.) Again, from the record and video footage, it is unclear if Mr. Castro-Reyes was physically capable of obeying the officers' instructions to flip over on the slippery tile floor given that his legs were completely restrained, various officers were pulling his limbs in different directions, and he had already been tased at least once. (*Id*.)

When the camera focus returned to Mr. Castro-Reyes, an officer who is not named in this action had pressed Mr. Castro-Reyes' face into the ground while several other officers pinned his body down. (*Id*.) Defendant Perez punched Mr. Castro-Reyes in the face three times, with what appears to be a closed fist, to "distract" him. (DE 107-4 at 92:5–7.) Defendant Bosque told Defendant Perez to stop hitting Mr. Castro-Reyes. (DE 107-3.) In response, Defendant Perez said, "What do you mean don't f***ing do it? Don't

f***ing tell me don't do it." (DE 107-4 at 99:12–13.) Simultaneously, Defendant Serrano repeatedly tased Mr. Castro-Reyes—about twenty times in total by Defendant Serrano's own admission[4]—on multiple parts of his body, although the Parties disagree as to whether Defendant Serrano ever tased Mr. Castro-Reyes on his neck as opposed to his shoulder. (DE 107-1 at 57:21–23; DE 107-2 at 75:13–14.) In the video footage, Mr. Castro-Reyes appeared to be writhing on the floor though it is unclear whether the motion was due to active resistance on his part or involuntary physical spasms in response to Defendant Serrano's continual use of his taser. (DE 107-3.)

At 3:53 PM, the officers decided to take Mr. Castro-Reyes outside. (*Id*.) Defendant Perez dragged Mr. Castro-Reyes out of the apartment by his pants, which had been around his ankles since the first officers arrived. (DE 107-2 at 20:22–21:22; DE 107-3; DE 107-4 at 13:14–15.) Mr. Castro-Reyes briefly held on to the doorframe for four or five seconds to avoid being dragged out, but Defendant Perez successfully overcame the brief resistance. (DE 107-3.) Video footage shows Mr. Castro-Reyes' head hit each of the concrete steps as he was dragged out of the apartment by his pants and feet. (*Id*.)

Once outside, Defendant Serrano continued to tase Mr. Castro-Reyes, and Defendant Perez turned to him and said, "No more taser Serrano, that's an order."[5] (DE 107-18.) Still, Defendant Serrano tased Mr. Castro-Reyes one last time. (*Id*.) Defendant Bosque asked, "Who is tasing?" to which there was no reply. (DE 107-3; DE 107-2 at 76:18–20.)

---

[4] Prior to this incident, Defendant Serrano had only ever used his taser twice. (DE 107-2 at 25:12.)

[5] Defendant Serrano, at his deposition, testified that no one tried to stop him from tasing Mr. Castro-Reyes. (DE 107-2 at 23:12–13.)

The officers finally flipped Mr. Castro-Reyes over at 3:54 PM. (DE 107-3.) Mr. Castro-Reyes, still on the ground, was handcuffed behind his back at 3:55 PM, eleven minutes after Defendants Bosque and Kelly first arrived. (DE 106 ¶ 18; DE 129 ¶ 18.) At this point, all the responding officers stepped away from Mr. Castro-Reyes, except for an officer, not named in this action, who kept his knee on top of Mr. Castro-Reyes' back for at least one minute. (DE 107-3.) After Mr. Castro-Reyes was handcuffed, Defendant Perez ordered Defendant Kelly to arrest him. (DE 107-5 at 27:7–28:6.) Defendant Kelly, however, refused to make the arrest due to Mr. Castro-Reyes' mental state, asking "what was he going to be arrested for?". (*Id.* at 27:7–18.) Defendant Perez threatened Defendant Kelly saying that "if [Defendant Kelly] did not make the arrest, [Defendant Perez] got something coming for [Defendant Kelly] on the back end." (*Id.* at 28:3–10.) Nonetheless, Defendant Kelly still refused to make the arrest and called the On-Call State Attorney the following day, who advised him that "if [he was] not comfortable with making th[e] arrest, [he did] not have to make the arrest." (*Id.* at 28:11–17.)

### C. Following the Incident

Mr. Castro-Reyes was transported to Jackson Memorial Hospital in handcuffs by fire rescue. (DE 111 ¶ 63; DE 126 ¶ 63.) Defendant Kelly went to the hospital following the incident. (DE 98 ¶ 23.) Dr. Jonathan Brandon told Defendant Kelly that he was going to involuntarily commit Mr. Castro-Reyes, i.e., "Baker Act" him, to perform a psychological evaluation. (*Id.*) However, other than Mr. Castro-Reyes' medical bills, there are no records of his hospital stay showing that he was in fact committed pursuant to Florida's Baker Act. Mr. Castro-Reyes remained at Jackson until September 25, 2020. (DE 111 ¶ 71.)

Mr. Castro-Reyes testified at his deposition that he could not recall any of the events leading up to his hospital stay, nor much after the fact. For example, he does not remember what injuries he sustained, nor does he remember how many days he was in the hospital.[6] (DE 107-6 at 11:12–12:11; DE 107-7 at 62:4–64:19.) Mr. Castro-Reyes testified that he does not remember whether he took any drugs on the day of the incident and denied ever using drugs with his cousin, Jose Varela. (DE 107-7 at 118:6–13, 120:5–10.) Mr. Castro-Reyes' family also testified that they had never seen him use drugs that day or at any previous time. (DE 107-8 at 38:24–25, 39:1–12, 41:4–6; DE 107-9 at 38:4–18; DE 107-11 at 32:20–25, 33:1.) Further, Mr. Castro-Reyes testified that his father told him he was admitted into the hospital because he was "beaten up" by the officers. (DE 107-6 at 63:4–11.) Mr. Castro-Reyes' family members were not allowed to visit him in the hospital. (DE 107-9 at 58:21–24.) Although the officers initiated documentation for Mr. Castro-Reyes' arrest, they did not arrest him following his hospital stay and never charged him with a crime. (DE 98 ¶ 30; DE 106 ¶ 25; DE 128 ¶ 30.)

### D. The Responding Officers and Their Past Conduct

Of all the responding officers, only Defendants Bosque, Kelly, Serrano, and Perez are named in this action. (DE 107-1 at 18:9–12.) It is undisputed that all responding officers, including Defendants Bosque, Perez, Serrano, and Kelly, were acting in their official capacity as City of Opa-Locka employees. (DE 98 ¶ 33; DE 128 ¶ 33.) At the time of the incident, Defendant Bosque supervised Defendant Serrano. (DE 107-2 at 10:15–

---

[6] Mr. Castro-Reyes maintains that he was handcuffed to his hospital bed during his hospital stay. While the body-camera footage from September 25, 2020, shows Mr. Castro-Reyes was not handcuffed at the time the interview was being conducted, handcuffs can be seen hanging from the side of the bed. (DE 107-21; DE 111 ¶ 71.)

18.) Defendants Serrano, Bosque, and Perez were subjects of an Internal Affairs investigation following this incident and Defendant Perez was charged with battery following the investigation. (*Id.* at 12:24–25:7.)

Defendant Bosque was a City of Opa-Locka Police Sergeant on the day of the incident. (DE 98 ¶ 1.) In Defendant Bosque's thirty-year career as an officer, he has been fired from the City of Opa-Locka approximately eight or nine times for reasons including insurance fraud, sexual battery, cocaine possession, and "conduct unbecoming an officer." (DE 107-1 at 5:9–6:14, 7:7–18.) Defendant Bosque was most recently terminated from his position in 2020, the same year as the underlying events in this action. (*Id.* at 6:21.) Moreover, Defendant Bosque has been arrested for armed kidnapping, battery, and witness tampering. (*Id.* at 9:17–19.) Of the eight battery accusations levied against Defendant Bosque, three were sustained. (DE 107-30 at 4–6.) Between 1994 and 2012, seven excessive force complaints were filed against Defendant Bosque, although only one was sustained. (DE 107-1 at 10:22–25; DE 107-14 at 4–8; DE 107-30 at 5.) Defendant Bosque had been disciplined approximately a dozen times prior to his interaction with Mr. Castro-Reyes. (DE 107-1 at 17:17–18.) A 2012 letter from the Chief of Police to the City of Opa-Locka City Manager explicitly stated that retention of Defendant Bosque would expose the City to continuing liability based on knowledge of Defendant Bosque's misconduct. (DE 107-30 at 28–30.)

Defendant Kelly has been a City of Opa-Locka Police Officer since 2008. (DE 98 ¶ 1; DE 107-5 at 8:7–22.) He was suspended once in 2012, for a charge that was ultimately dismissed. (DE 107-5 at 8:16–24.) Defendant Kelly has never been accused of using excessive force. (*Id.* at 17:21–23.)

Defendant Perez was a City of Opa-Locka Police Officer for about fourteen years until he was relieved of duty in November 2022. (DE 107-4 at 5:1–2, 17:25–18:2.) Prior to this incident, Defendant Perez was fired due to an incident that resulted in the death of four individuals following a car chase in 2013. (DE 107-1 at 20:7–11; DE 107-4 at 24:3–15.) Defendant Perez has been accused of using excessive force seven times. (DE 107-4 at 18:11–14.) Defendant Perez has been criminally charged three times, once for reckless driving and twice for misdemeanor battery. (*Id.* at 5:14–23.) One of the battery charges stemmed from the encounter with Mr. Castro-Reyes. (*Id.* at 6:24–7:1.) After this incident, an internal investigation was conducted and concluded in 2020. (*Id.* at 21:6–12.) However, the investigation was reopened in 2022 under a new chief of police. (*Id.* at 7:14–8:20.)

Defendant Serrano has been a City of Opa-Locka Police Officer for about fifteen years. (DE 107-2 at 5:1–8.) Defendant Serrano has never been arrested or accused of a crime. (*Id.* at 6:16–19.) One complaint of excessive force was filed against Defendant Serrano in 2008 or 2009, which was not sustained. (*Id.* at 7:25–8:5.) Defendant Serrano has never been fired during his career as a police officer but was once suspended from duty for not responding to a call. (*Id.* at 9:3–10:5.)

### E.  The Instant Action

On May 4, 2022, Mr. Castro-Reyes filed suit against the Defendant Officers and the Defendant City. Mr. Castro-Reyes alleges violations of his Fourth and Fourteenth Amendment constitutional rights pursuant to 42 U.S.C. § 1983, against Defendant Officers for unlawful entry (Count I), false arrest (Count II), and excessive force (Count III) (DE 48 ¶¶ 51–100.) Further, Mr. Castro-Reyes alleges a violation of his Fourth

Amendment rights against the City for failing to train its officers and for following a policy of concealing officer misconduct (Count VI). (*Id.* ¶¶ 115–136.) The remaining five counts allege state-law tort claims of assault and battery (Counts IV and VII) and false imprisonment (Counts V and VIII) against all Defendants. (*Id.* ¶¶ 101–114, 137–151.) The last count alleges negligent training and supervision against the City (Count IX). (*Id.* ¶¶ 152–156.) Mr. Castro-Reyes moved for partial summary judgment on all counts except for Count IX, negligent training and supervision against the City. (DE 109.) Defendants moved for summary judgment on all claims. (DE 99; DE 100; DE 103; DE 108.)

## II.     LEGAL STANDARD

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed R. Civ. P. 56(e)). The Court must view the record and all factual inferences in the light most favorable to the non-moving party and decide whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251–52).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue

for trial. *See* Fed R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Credibility determinations, weighing evidence, and drawing legitimate inferences are for a jury, not a judge. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994).

## III.   DISCUSSION

### A.   *42 U.S.C. § 1983 Claims Against Defendant Officers*

Mr. Castro-Reyes brings Counts I, II, and II of this action against Defendant Officers pursuant to 42 U.S.C. § 1983. Title 42 § 1983 "was passed 'to interpose the federal courts between the States and the people, as guardians of the people's federal rights,'" and, therefore, "federal courts are entrusted with providing a forum for the vindication of federal rights violated by state or local officials acting under color of state law." *Haywood v. Drown*, 556 U.S. 729, 735 (2009) (citing *Mitchum v. Foster*, 407 U.S. 225, 242 (1972)). Although § 1983 did not include any immunities or defenses, the Supreme Court crafted the concept of qualified immunity to "reflect[] an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also the need to protect officials who are required to exercise discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 800 (1982). Accordingly, Defendant Officers argue that qualified immunity shields them from liability as to all of Mr. Castro-Reyes' § 1983 claims.

To receive the protection of qualified immunity, Defendant Officers must first prove that they were acting within the scope of their discretionary authority. *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019). Because there is no dispute that Defendant Officers were acting within their discretionary duties at the time of the incident, they are afforded the presumption of qualified immunity. *Id.* Thus, the burden shifts to Mr. Castro-Reyes to show that Defendant Officers (1) committed a constitutional violation; and (2) that this violation was "clearly established." *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021). A plaintiff can show a law is "clearly established" in three ways: (1) a materially similar case has already been decided to give police notice; (2) a broader, clearly established principle should control the facts of this case; or (3) an officer's conduct obviously violates the constitution. *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).

This analysis is undertaken in light of the context of each case. *Lee v. Ferraro,* 284 F.3d 1188, 1282 (11th Cir. 2002). Although factual inferences are made in the plaintiff's favor, this only applies to the extent the plaintiff's version of events is supported by the record. *Penley v. Eslinger*, 605 F.3d 843, 853 (11th Cir. 2010). Assisting officers are typically entitled to qualified immunity if there is no indication that they either acted unreasonably in following the lead of the primary officer, or that they knew or should have known that their conduct might result in a Fourth Amendment violation, even when the primary officer is not entitled to qualified immunity. *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001). The Court examines each count in turn.

### 1. Count I - Unlawful Entry Against Defendant Officers

To rebut the presumption of qualified immunity, Mr. Castro-Reyes must show that Defendant Officers violated his constitutional rights when they first entered his home. It is clearly established that a warrantless entry into a home violates the Fourth Amendment unless the officer had consent, or exigent circumstances demanded entry. *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1328 (11th Cir. 2006). Mr. Castro-Reyes argues summary judgment is appropriate here because it is undisputed that Defendant Officers entered his home without consent, a warrant, exigent circumstances, or probable cause. Defendant Officers respond that they are entitled to summary judgment because they received explicit consent from Mr. Castro-Reyes' family members to enter the apartment.

Defendants Bosque and Kelly did not have a warrant, nor were they investigating a crime upon their arrival. However, Defendants Bosque and Kelly responded to the family's 911 call and were greeted by Mr. Castro-Reyes' cousin who walked them to the apartment where Mr. Castro-Reyes and his aunt were located with the door wide open. Although Defendants Bosque and Kelly did not know who resided in the apartment upon entering and Mr. Castro-Reyes asked Defendant Officers to leave, Mr. Castro-Reyes' aunt, Ms. Ayala, told Defendant Officers to enter the apartment. Even if his aunt did not have the authority to consent, there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that he obtained valid consent to enter a premises. *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997).

Examining the totality of the circumstances, Defendants Bosque and Kelly are entitled to qualified immunity as to Count I because no constitutional violation occurred.[7]

Similarly, Defendants Serrano and Perez, as responding backup officers, are entitled to qualified immunity as to Count I because there is no indication that they acted unreasonably in following the lead of the primary officer. *Brent*, 247 F.3d at 1305–06. It is undisputed that Defendants Serrano and Perez believed they were responding to an emergency and needed to secure Mr. Castro-Reyes. Given the circumstances, a reasonable officer in Defendants Serrano and Perez's position had no reason to suspect they entered Mr. Castro-Reyes' home unlawfully, especially given that Defendants Bosque and Kelly were already inside upon their arrival. As such, all Defendant Officers are granted summary judgment as to Count I.

### 2. Count II - False Arrest Against Defendant Officers

To be entitled to qualified immunity as to Count II, Defendant Officers must show there was probable cause to detain Mr. Castro-Reyes under Florida's Baker Act.[8] *Khoury,* 4 F.4th at 1126. Under Florida's Baker Act, an individual can be involuntarily committed for a mental health examination if there is a substantial likelihood that without care, that person would cause serious bodily injury to himself or others in the near future. Fla. Stat. § 394.463(1)(b)(2). Defendant Officers are still entitled to qualified immunity if they had

---

[7] Although Defendant Officers also argue that exigent circumstances justified the entry, the Court need not determine whether exigent circumstances existed because there is no dispute that there was explicit consent from Mr. Castro-Reyes' family.

[8] Mr. Castro-Reyes disputes whether he was Baker Acted as opposed to arrested. However, for purposes of determining whether there was a constitutional violation, Defendant Bosque only needed probable cause to involuntarily commit Mr. Castro-Reyes under the Baker Act.

arguable probable cause. *Khoury*, 4 F.4th at 1126. Arguable probable cause exists if a reasonable officer, knowing the information Defendant Officers possessed, could have believed that probable cause existed to involuntarily commit Mr. Castro-Reyes. *Id*. Mr. Castro-Reyes argues he is entitled to summary judgment as to Count II because he did not present a danger to himself or to others. Defendant Officers argue they are entitled to summary judgment because probable cause existed to detain Mr. Castro-Reyes under Florida's Baker Act.

It is undisputed that Mr. Castro-Reyes was tied up with electrical cords and restrained by his family members who expressed great concern for his mental wellbeing when officers first arrived and, when asked to identify himself, Mr. Castro-Reyes stated that he was God. However, the Parties disagree as to whether this is enough to establish that Mr. Castro-Reyes posed a significant threat to himself or others warranting involuntary commitment. While it is clear Mr. Castro-Reyes was experiencing some sort of mental health issue, that alone is not enough to ascertain the need for commitment pursuant to the Baker Act. *See Khoury*, 4 F.4th at 1128 n.7. Furthermore, the record is clear that Mr. Castro-Reyes did not attempt to strike or physically harm anyone at any point during the incident. Even so, the fact that Mr. Castro-Reyes' family thought it was necessary to restrain him, and that Mr. Castro-Reyes was experiencing delusional ideation, could be enough to demonstrate Mr. Castro-Reyes needed to be committed from the perspective of a reasonable officer. Ultimately, a jury will have to determine whether Mr. Castro-Reyes exhibited behavior which justified Defendant Bosque's conclusion that there was a substantial likelihood that without care he would cause serious bodily harm to himself or to others. Further, it will be for a jury to decide whether Defendant Kelly,

equipped with the same information as Defendant Bosque, acted reasonably in following his lead. Thus, summary judgment as to Count II for Defendant Bosque, Defendant Kelly, and Mr. Castro-Reyes is inappropriate.

However, Defendants Serrano and Perez are entitled to qualified immunity because there is no indication that a reasonable officer in their position would have thought Defendant Bosque did not have probable cause to detain Mr. Castro-Reyes. As such, Defendants Serrano and Perez are entitled to summary judgment as to Count II.

### 3.  Count III - Excessive Force Against Defendant Officers

Regardless of whether Defendant Bosque had probable cause to detain Mr. Castro-Reyes, his excessive force claim must be analyzed independently because Mr. Castro-Reyes alleges the force was excessive regardless of the legality of the detention. *Hardigree v. Lofton*, 992 F.3d 1216, 1231 n.7 (11th Cir. 2021).[9] The Fourth Amendment encompasses the right to be free from excessive force. However, the right to make an arrest carries with it the ability to use some degree of physical force to effect that arrest. *See Graham v. Connor*, 490 U.S. 386, 394–96 (1989). The use of *de minimis* force will not support a claim of excessive force under the Fourth Amendment. *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).

Conducting the inquiry to determine whether an excessive force constitutional violation has occurred, the Court examines whether a reasonable officer would believe the level of force used was necessary for the situation at hand. *Lee, 2*84 F.3d at 1197 (citations omitted). Reasonableness depends on the seriousness of the crime, whether

---

[9] Typically, when a plaintiff claims that an officer used excessive force to effectuate an illegal arrest, the excessive force claim is subsumed within the unlawful arrest claim. *Khoury*, 4 F.4th at 1130.

the suspect poses an immediate danger to the officer or others, and whether the subject is resisting or evading arrest. *Graham*, 490 U.S. at 396. Generally, defendants are not entitled to qualified immunity if the officers used excessive force when a suspect is under control, not resisting, and obeying commands. *Patel v. City of Madison*, 959 F.3d 1330, 1243 (11th Cir. 2020) (citations omitted). The inquiry into whether an individual is resisting requires examining the exact moment when the force is utilized. *Ingram v. Kubik*, 30 F.4th 1241, 1254 (11th Cir. 2022) ("[U]sing seriously injurious force against even a previously fractious arrestee is unlawful if at the time of arrest he was offering no resistance at all.") (internal citations omitted). Furthermore, "it is of no moment [if the individual] was not yet under physical control in that circumstance." *Id.*

Here, Mr. Castro-Reyes had not committed any crime, was bound by his legs and ankles at all relevant times, was partially handcuffed for nearly the entire encounter, and never struck or attempted to strike anyone. Although Mr. Castro-Reyes did not immediately obey commands to turn over, it is unclear whether he was physically or mentally capable of doing so. Similarly, it is unclear whether he was, at all times, actively avoiding arrest; whether his body was being pulled in different directions by the numerous officers on scene; or whether he was having involuntary physical spasms due to Defendant Serrano's repeated use of his taser. Mr. Castro-Reyes argues he is entitled to summary judgment because the force utilized by Defendant Officers was clearly excessive. Defendants Bosque and Kelly argue that there is no record evidence that they used excessive force, and Defendants Serrano and Perez argue the force utilized was reasonable under the circumstances.

*a. The record does not support a finding that Defendants Bosque and Kelly utilized unconstitutional force.*

From review of the record, there are no facts suggesting Defendants Bosque or Kelly employed more force than necessary to effectuate implementation of a Baker Act protocol. Defendants Bosque and Kelly attempted to flip Mr. Castro-Reyes over and grabbed his hands to place him in handcuffs. These actions amount to *de minimis* force and are much less egregious than cases in which courts have held an officer's force was not excessive. *See Taylor v. Taylor,* 649 F. App'x 737, 746 (11th. Cir. 2016) (finding no excessive force where defendant officer grabbed plaintiff from behind, threw him against a van, kneed him, and pushed his head into the side of a van). Accordingly, as to Defendants Bosque and Kelly, summary judgment is granted because their actions do not rise to the level of a constitutional violation. *See also Baxter v. Roberts*, 54 F.4th 1241, 1269 (11th Cir. 2022) (finding bodycam footage showing arrest only depicted "commonplace use of force").[10]

*b. Defendant Officers Serrano and Perez are not entitled to summary judgment regarding their use of force.*

As to Defendants Serrano and Perez, Mr. Castro-Reyes points to three undisputed facts to support his claim for excessive force: Defendant Serrano tasing Mr. Castro-Reyes numerous times; Defendant Perez punching Mr. Castro-Reyes in the face three times; and Defendant Perez dragging Mr. Castro-Reyes down concrete stairs by his pants. But

---

[10] Mr. Castro-Reyes argues that regardless of which officers actually struck him, they are all liable for failing to intervene. But Mr. Castro-Reyes does not allege failure to intervene in his First Amended Complaint and, as such, cannot raise it as a cause of action at the summary judgment stage. *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004).

there are also several disputed issues of material fact as to whether the force used by Defendants Serrano and Perez was necessary considering the circumstances. When they arrived, Defendants Serrano and Perez were unaware of the nature of the call for assistance, although both attest they arrived at the scene thinking they needed to help with a potentially violent suspect who was resisting arrest. However, the video footage reveals that when Defendants Serrano and Perez arrived at the apartment, Mr. Castro-Reyes lay on his back bound by his ankles and legs. With both of his hands laced together on his chest, one hand was in a handcuff held by Defendant Kelly, and he was in a chokehold by Mr. Varela. Again, Mr. Castro-Reyes had not committed any crime and had not been violent with anyone.

Furthermore, neither Defendant Serrano nor Defendant Perez were instructed to tase or punch Mr. Castro-Reyes. In fact, they were both asked to stop by Defendant Bosque. Indeed, Defendant Serrano was explicitly ordered to stop tasing. It is also undisputed that at no point did Mr. Castro-Reyes attempt to strike any of the responding officers. Consequently, there remain disputed issues of material fact as to whether using a taser twenty times, punching Mr. Castro-Reyes three times, and dragging Mr. Castro-Reyes by his feet down concrete stairs was reasonable. *See Patel*, 959 F.3d at 1340 (finding a disputed issue of material fact existed as to whether officers' use of force was proportional to situation at hand, precluding qualified immunity).

Even if Defendants Serrano and Perez's actions violated a constitutional right, they may still be entitled to qualified immunity if Mr. Castro-Reyes cannot show that the right was clearly established at the time of the encounter. *See Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) (citations omitted). A constitutional right is clearly established if a

reasonable officer would understand the conduct violates that right. *Id.* As to Defendant Serrano's use of the taser, the Eleventh Circuit has found that deploying a taser eight to twelve times on a restrained, mostly cooperative and unviolent plaintiff is so disproportionate it violates a clearly established right. *Id.* at 908. On the other hand, the Eleventh Circuit has held that the repeated use of a taser to subdue an unrestrained, violent individual was not so "obvious" as to say the officers violated a clearly established right. *See Hoyt v. Cooks*, 672 F.3d 972, 978–80 (11th Cir. 2012). Here, whether Defendant Serrano violated a clearly established right rests on whether the jury believes Mr. Castro-Reyes was mostly cooperative and nonviolent. *See Patel*, 959 F.3d at 1343 (finding that whether defendant officers violated a clearly established right depended on whether jury believed plaintiff's version of events). Consequently, as there are disputed issues of fact, Defendant Serrano is not entitled to summary judgment on Count III.

As to Defendant Perez's conduct, it is clearly established that "police officers cannot employ gratuitous and seriously injurious force against non-resisting suspects who are under control." *Ingram*, 30 F.4th at 1252. This is true even for "a previously fractious arrestee." *Id.* (internal citations omitted). The video footage shows that in the moment right before Defendant Perez punched Mr. Castro-Reyes in the face multiple times, at least three other officers were on top of Mr. Castro-Reyes,[11] including one officer who was already holding his face against the floor. Mr. Castro-Reyes' ankles and legs

---

[11] Defendant Perez references Mr. Castro-Reyes' "superhuman strength" as justification for his force. However, from the video footage it appears that the officers on the scene have control of Mr. Castro-Reyes and are pulling him in various directions. Ultimately, it is for a jury to decide whether Mr. Castro-Reyes was actively resisting at the moment Defendant Perez punched him or whether the resistance perceived by Defendant Perez was simply his fellow officers tugging Mr. Castro-Reyes in another direction.

remained bound, and one hand remained handcuffed and in the grasp of an officer.[12] Defendant Serrano had already deployed his taser on Mr. Castro-Reyes at least once. At no point in the entire interaction, and certainly not when Defendant Perez punched him, did Mr. Castro-Reyes attempt to strike anyone. If a jury believes Mr. Castro-Reyes' version of the facts—where Mr. Castro-Reyes, a teenager bound by his legs, partially handcuffed, pinned down by multiple other officers, and feeling the aftershocks of a taser, was nonviolent and under control—it could reasonably find that Defendant Perez knowingly violated clearly established principles articulated in a line of excessive force cases "establish[ing] that unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment." *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011).

A similar analysis applies to Defendant Perez's decision to drag Mr. Castro-Reyes out of the apartment and down concrete stairs by his pants. When Defendant Perez began to drag Mr. Castro-Reyes, Mr. Castro-Reyes had already been tased multiple times by Defendant Serrano and appeared to be curled up in the fetal position. Mr. Castro-Reyes' legs and feet remained bound, and each hand was in a separate set of handcuffs. While Mr. Castro-Reyes briefly held on to the doorframe to resist being pulled down the concrete stairs without his head secured, his hold on the door lasted only four or five seconds. The Eleventh Circuit has determined in another excessive force case that plaintiff "covering

---

[12] It is irrelevant that Mr. Castro-Reyes' other hand had not yet been handcuffed. *See Patel*, 959 F.3d at 1340 ("As we expressly recognized in *DeGiovanni*, 'While [most of] these cases involve plaintiffs who were handcuffed after their arrest before excessive force was used by the officer, the same rationale applies to the use of gratuitous force when the excessive force is applied prior to the handcuffing . . .'") (quoting *Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 (11th Cir. 2017)).

his head in a protective manner" for "a matter of seconds [was] not active resistance" and did not justify the officer punching plaintiff in response. *Longino v. Henry Cnty.*, 791 F. App'x 828, 837 (11th Cir. 2019).

A recent Eleventh Circuit decision reviewing qualified immunity jurisprudence supports this interpretation. In *Acosta v. Miami-Dade County*, the Eleventh Circuit found a violation of clearly established excessive force law where officers continued to tase and kick an individual who had initially fled from officers, led them on a chase through the neighborhood, and allegedly attempted to fight the officers off by using his elbows in a jerking motion. 97 F.4th 1233, 1241 (11th Cir. 2024). There, the plaintiff had even knocked an officer down in his efforts to evade apprehension. *Id.* The Eleventh Circuit reasoned that despite his previous behavior, once the individual was on the ground, surrounded by multiple officers, and no longer fighting officers, the continued use of gratuitous force on an individual who no longer posed a threat to the officers' safety was a clear violation of established law. *Id.* at 1242 ("[I]t was clearly established in February 2014 that a police officer is prohibited from using force against a non-resisting suspect.") (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1333 (11th Cir. 2008); *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000); *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997)). Thus, a reasonable officer in the same circumstances as Defendant Perez should have known that punching and dragging Mr. Castro-Reyes, who was pinned to the ground and suffering the aftershocks of a taser, violated a clearly established right. Accordingly, Defendant Perez is not entitled to summary judgment on Count III.

**B. Count VI - Municipal Liability Claim Against Defendant City of Opa-Locka**

In Count VI, Mr. Castro-Reyes alleges a 42 U.S.C. § 1983 claim against the City for Fourth Amendment violations. Among other policies, he alleges that the City had a *de facto* policy or custom of concealing and/or suppressing officer misconduct, including misconduct involving the use of unlawful force and unlawful seizures. Mr. Castro-Reyes' municipal liability claim is predicated solely on Defendant Bosque. Therefore, the Court only examines municipal liability as it relates to Defendant Bosque's conduct.

To find the City liable, Mr. Castro-Reyes must show that his constitutional injuries were caused by a persistent and widespread custom or policy which was the "moving force" of the constitutional violation. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–94 (1978). Only officials with "final policymaking authority" can render the municipality liable. *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th. Cir. 1996). A municipality's failure to correct the constitutionally offensive actions of its officers may rise to the level of a "custom or policy" if there is tacit authorization of or deliberate indifference to the misconduct. *Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir. 1987) (citations omitted). However, the number of complaints against an officer has no relation to their validity. *Id*. Instead, a plaintiff must present some evidence from which a reasonable jury could infer those complaints were meritorious. *Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1274 (S.D. Fla. 2013).

Mr. Castro-Reyes argues the City's continued employment of Defendant Bosque, despite his prior complaint history, is enough to establish a custom or policy under *Monell.* The City does not specifically rebut any of the *Monell* factors but broadly argues that Mr. Castro-Reyes has not met his evidentiary burden. The City's decision to repeatedly

rehire[13] Defendant Bosque after he consistently flouted departmental rules, regulations, and the laws he is entrusted to enforce, could be sufficient to demonstrate a pervasive custom or policy of summarily ignoring illegal or unconstitutional behavior by department officers.[14] Furthermore, the City's promotion of Defendant Bosque could be interpreted as a signal to officers in the department that even egregious violations of the law will not prevent them from being placed in a leadership position with the ability to direct their peers.

The record also makes clear that individuals with policymaking authority knew of Defendant Bosque's disregard for the law and department policies. In 2012, the Chief of Police, Cheryl Carson, wrote a letter to the City Manager of Opa-Locka stating that:

> "Sergeant Bosque's record with the Opa-Locka Police Department is replete with numerous allegations of misconduct; disciplinary actions; investigations; and discipline that demonstrate what *amounts to a consistent pattern and course of misconduct that place the City of Opa-Locka and our Police Department in a very precarious position*. Continuing to retain Sergeant Bosque in any capacity as a law enforcement officer exposes and will continue to expose the city to liability . . ."

(DE 107-27 at 2–3.) The City does not dispute the veracity of this letter and it is reasonable to conclude that this letter remained in Defendant Bosque's personnel file and that future chiefs of police and city managers were on notice of the City's ongoing exposure to liability. *See also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 411 (1997) *(*"[W]here adequate scrutiny of an applicant's background would lead a

---

[13] Despite Defendant Bosque's multiple terminations, the record is silent as to why he was continually reinstated as a police officer.

[14] Although not cited by Mr. Castro-Reyes in this context, it should be noted, as discussed *supra* Part I.D., that Defendant Perez was fired due to his actions in an incident that resulted in the death of four individuals. He was later rehired by the City for unknown reasons.

reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right . . . the official's failure to adequately scrutinize the applicant's background [can] constitute 'deliberate indifference.'")

Although the Court finds that the record supports a finding of a custom or policy of the City disregarding illegal or unconstitutional behavior by Defendant Bosque, Mr. Castro-Reyes must still demonstrate "a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Another trial court in this circuit has recently held that "causation [can]not be determined at the summary judgment stage." *Yancey v. Tillman*, No. 1:20-CV-03269-VMC, 2023 WL 7295164, at *17 (N.D. Ga. Sept. 29, 2023) (citing *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 29 (1st Cir. 2005)). Drawing all reasonable inferences in Mr. Castro-Reyes' favor, the Court finds that a juror could reasonably infer that, had the City implemented and maintained consequences for unconstitutional conduct for its police force, Defendant Bosque would have behaved differently in his interaction with Mr. Castro-Reyes.

Because Mr. Castro-Reyes' municipal liability claim is focused solely on Defendant Bosque, the Court only examines municipal liability as it relates to Defendant Bosque's conduct, that is, the one remaining claim against Defendant Bosque, false arrest. *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 412 ("[A] finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff.") (emphasis in original). Accordingly,

the City's motion for summary judgment as to Count VI is denied but only with regard to the false arrest claim against Defendant Bosque.

### C. State Law Claims

Mr. Castro-Reyes alleges three counts of state-law tort claims against Defendants: assault and battery, false imprisonment, and negligent training and supervision. To hold Defendant Officers personally liable in tort, Mr. Castro-Reyes must show Defendant Officers acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property and that their actions meet the elements of each tort. Fla. Stat. § 768.28(9)(a). If not, they are entitled to statutory immunity and only the City can be liable for Defendant Officers' actions. *Id.* A determination of whether an act was committed in bad faith, malicious purposes, or with wanton and willful disregard may be decided by a court as a matter of law depending on the facts at hand. *Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004). "Bad faith" and "malicious" are synonymous and require a finding that the act was committed with "ill will, hatred, spite, or an evil intent." *Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1325 (11th Cir. 2022) (citing *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. Dist. Ct. App. 2020)). "Wanton and willful disregard" is conduct worse than gross negligence. *Id.* The Court must determine whether each Defendant Officer is entitled to immunity based on each claim against him. *Id.* at 1326.

1.  **Counts IV & VII – Assault & Battery against Defendant Officers and Defendant City of Opa-Locka[15]**

Mr. Castro-Reyes alleges assault and battery, Count IV, against all Defendant Officers, as well as assault and battery, Count VIII, against the City. Defendant Officers argue they are entitled to statutory immunity. Because it is undisputed that the officers were acting in the course and scope of their employment, the Court turns to whether liability attaches to the Defendant Officers. To hold the Defendant Officers personally liable, Mr. Castro-Reyes must show that the Defendant Officers committed an assault or battery in bad faith, with malicious purposes, or with wanton or willful disregard. *Coleman*, 41 F.4th at 1329.

While Mr. Castro-Reyes argues that Defendants Bosque and Kelly's attempt to flip him over constitutes an assault and battery, Mr. Castro-Reyes does not cite to a single fact which would create a disputed issue as to whether Defendants Bosque and Kelly acted with the requisite bad faith, malice, or wanton disregard as to render them personally liable. Florida law requires more than just evidence of an unlawful contact, i.e., an assault or battery. *Id.* (holding even if defendant officers' conduct constituted a battery, there was no evidence that defendant officers acted in bad faith, with malice, or with

---

[15] In his Motion for Summary Judgment, Defendant Perez posits that if the federal excessive force claims fail, so do the state-law assault and battery claims. Defendant Perez does not cite to any binding authority for this position, nor do the Eleventh Circuit opinions he cites expressly hold so, despite upholding lower courts' decisions to dismiss state claims in conjunction with dismissal of federal claims. *See Bright v. Thomas*, 753 F. App'x 783 (11th Cir. 2018); *Harris v. Wingo*, 845 F. App'x 892 (11th Cir. 2021). In fact, district courts have held that an officer may be entitled to qualified immunity as to the federal claims, while also holding that questions of fact preclude summary judgment as to the state-law claims. *See Gomez v. Lozano*, 839 F. Supp. 2d 1309, 1323 (S.D. Fla. 2012) (stating defendant officer's position "wrongly assumed" the same excessive force standard applies to § 1983 claims and Florida assault and battery claims).

wanton disregard). Thus, as to Count IV, Defendants Bosque and Kelly are entitled to statutory immunity.

As to Defendants Serrano and Perez, Mr. Castro-Reyes was tased twenty times, punched three times, and then dragged out of his apartment while mostly restrained by electrical cords, causing him to hit his head on the concrete steps. Mr. Castro-Reyes argues that Defendant Serrano's repeated use of the taser creates a disputed issue of material fact as to whether he acted in bad faith, with malice, or with wanton or willful disregard. Mr. Castro-Reyes argues that Defendant Perez's three closed-fist punches and his dragging Mr. Castro-Reyes down concrete stairs creates a disputed issue of material fact as to whether he acted in bad faith, with malice, or wanton or willful disregard. Furthermore, both Defendants Serrano and Perez were told to stop tasing and punching Mr. Castro-Reyes. In response, Defendant Serrano tased Mr. Castro-Reyes again, and Defendant Perez raised his voice at his fellow officer and asked why he should not punch Mr. Castro-Reyes. Finally, Defendants Serrano and Perez, as backup officers, concede they did not know exactly what type of incident they were responding to.

All of these facts are sufficient to create a disputed issue as to whether the amount of force used by these officers demonstrated a wanton or willful disregard for Mr. Castro-Reyes' rights or safety. *See Thompson v. Douds*, 852 So. 2d 299, 309 (Fla. Dist. Ct. App. 2003) (finding a disputed issue of fact as to whether backup officers acted with wanton and willful disregard when they administered knee blasts as "compliance techniques" without knowing why the original officers were struggling with the plaintiff); *Coleman*, 41 F.4th at 1326. Thus, whether Defendants Serrano or Perez will be personally liable as

opposed to the City depends on whether a jury concludes that Defendants Serrano and Perez acted with wanton or willful disregard to Mr. Castro-Reyes' safety and rights.

Regardless of Defendant Officers' statutory immunity defense, Mr. Castro-Reyes must still prove the elements of each claim against each officer. An assault consists of "an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." *Sullivan v. Atl. Fed. Sav. & Loan Ass'n*, 454 So. 2d 52, 54 (Fla. Dist. Ct. App. 1984). A battery is the intentional infliction of a harmful or offensive contact upon the person of another. *Id.* In addition to looking at the circumstances surrounding the use of force, Florida courts also look at the level of force used. *See Thompson*, 852 So. 2d at 309. A presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive. *City of Miami v. Sanders*, 672 So. 2d 46 (Fla. Dist. Ct. App. 1996). As already noted, there is nothing in the record to suggest that Defendants Bosque or Kelly used more force than necessary to effectuate commitment pursuant to the Baker Act. Consequently, the City is entitled to summary judgment as to Count VII as it relates to Defendants Bosque and Kelly.[16] But, the City can be liable for the actions of Defendants Serrano and Perez under Count VII if Mr. Castro-Reyes meets the elements of assault and battery.

---

[16] The legality of the detention does not change this Court's holding regarding whether Defendants Bosque or Kelly used excessive force as to amount to a battery. *See Baxter*, 54 F.4th at 1271–72 (finding issues of fact precluded summary judgment on false imprisonment claim, while affirming summary judgment for defendant officers as to state-law battery claim because use of force was clearly not excessive).

Mr. Castro-Reyes argues that he is entitled to summary judgment as a matter of law as to Count VII because there is no dispute that the officers "intentionally battered" and placed Mr. Castro-Reyes in fear of imminent violence. However, for the reasons already discussed—Mr. Castro-Reyes' purported resistance and Defendants Serrano and Perez's continued contact with Mr. Castro-Reyes despite being asked to stop—there is a dispute as to whether Defendants Serrano or Perez's contact was excessive under the circumstances. Therefore, Mr. Castro-Reyes is not entitled to summary judgment as to Count VII because there is a dispute as to whether this conduct was lawful. *See Butler v. Gualtieri*, 41 F.4th 1329, 1338 (11th Cir. 2022) (affirming denial of cross motions for summary judgment as to state-law claims because there was a disputed issue of fact as to whether defendant officer's takedown of plaintiff was proportional to plaintiff's resistance).

### 2. Counts V & VIII – False Imprisonment against Defendant Officers and Defendant City of Opa-Locka[17]

Mr. Castro-Reyes alleges false imprisonment, Count V, against all Defendant Officers, and in Count VIII against the City. To prevail on these claims, Mr. Castro-Reyes must show that the Defendant Officers detained him in bad faith, with malice, or with wanton and willful disregard. Defendants argue that there is no record evidence to suggest that their efforts to commit Mr. Castro-Reyes pursuant to the Baker Act was done in bad faith, with malice, or with wanton and willful disregard. The record reflects Defendant Officers responded to a 911 dispatch after Mr. Castro-Reyes' family members

---

[17] False arrest and false imprisonment are the same under Florida law. *Coleman*, 41 F.4th at 1327.

requested assistance due to his mental condition. There is no record evidence of a previous relationship between Mr. Castro-Reyes and the Defendant Officers, or anything that would indicate any intent to harm Mr. Castro-Reyes. *See Coleman*, 41 F.4th at 1327 (finding that an officer's repeated visits to plaintiff's home was not enough to create a genuine issue as to whether officer acted with intent to hurt plaintiff).

There is nothing to suggest that Defendant Bosque pursued detention for Baker Act proceedings for any reason other than an assessment that Mr. Castro-Reyes' detention was warranted, and nothing to suggest Defendants Kelly, Serrano, and Perez assisted for any other reason than it was their duty to follow Defendant Bosque's assessment. Even if, as discussed *supra,* Defendant Bosque did not have probable cause to detain Mr. Castro-Reyes, that is insufficient predicate for actual malice. *See Coleman*, 41 F.4th at 1327 (holding the lack of probable cause does not amount to actual malice). As such, Defendant Officers are entitled to statutory immunity as to Count V. However, the City still can be held liable under Count VIII if Mr. Castro-Reyes proves the elements of false imprisonment.

To prevail on his false imprisonment claim against the City, Mr. Castro-Reyes must show that he was "unlawfully restrained without color of authority." *Everett v. Fla. Inst. Of Tech.,* 503 So. 2d 1382, 1383 (Fla. Dist. Ct. App. 1987). The existence of probable cause is a defense to false imprisonment. *Jackson v. Navarro*, 665 So. 2d 340, 342 (Fla. Dist. Ct. App. 1995).[18] As already discussed, a reasonable jury could conclude that Defendant

---

[18] The City contends that because Defendant Officers had at least arguable probable cause to Baker Act Mr. Castro-Reyes, it is entitled to summary judgment on Count VIII. Mr. Castro-Reyes argues he is entitled to summary judgment as to Count VIII because "arguable probable cause" is not a defense to the state-law tort false imprisonment, as it is for the federal claim of false arrest. Defendants do not cite to any authority which rebuts

Bosque did not have probable cause to detain Mr. Castro-Reyes under Florida's Baker Act. Pivotal to this claim is whether, looking at all the record evidence, a jury could find Mr. Castro-Reyes actually presented a danger to himself or to others to necessitate the Baker Act involuntary commitment. Because there is a disputed issue as to whether Mr. Castro-Reyes' detention was unlawful, summary judgment as to Count VIII is inappropriate.[19]

### 3. Count IX – Negligent Training/Supervision against Defendant City of Opa-Locka

The City moves for summary judgment as to Count IX, negligent training/supervision. Under Florida law, an employer can be liable in tort for negligent training of its employees. *McFarland & Son, Inc. v. Basel*, 727 So. 2d 266 (Fla. Dist. Ct. App. 1999). Nonetheless, governmental entities are immune from liability arising from discretionary functions, such as determinations regarding the content of police training. *Land v. Sheriff of Jackson Cnty.*, 85 F.4th 1121, 1130 (11th Cir. 2023) (affirming summary judgment on negligent training count to defendant sheriff based on sovereign immunity).

The City contends it is entitled to sovereign immunity as to Count IX because its decisions to train its officers is an exercise of governmental discretion regarding policy

---

this argument, but instead emphasize that there was probable cause to detain Mr. Castro-Reyes.

[19] If a jury concludes that Defendant Officers had probable cause to involuntarily commit Mr. Castro-Reyes, he still argues that his 96-hour stay at the hospital was false imprisonment. However, as Mr. Castro-Reyes did not allege the hospital stay violated Florida's Baker Act, or even allege that the hospital stay constituted false imprisonment in his initial Complaint, Mr. Castro-Reyes is precluded from raising this issue at this juncture. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004).

and planning. Mr. Castro-Reyes argues the Court should reject this argument because the City did not provide any "substantive analysis" as to this argument. But Mr. Castro-Reyes has the burden of proving his case. Simply arguing that the City failed to provide "substantive analysis," without supporting case law or record evidence that creates a disputed issue of material fact, does not defeat a request for summary judgment.

An employer can be liable for negligent supervision if the employer is aware or should have become aware that an employee was unfit to work. *Garcia v. Duffy*, 492 So. 2d 435, 438–39 (Fla. Dist. Ct. App. 1986). A negligent supervision claim requires that the actions of its employees be outside of the course and scope of the employee's employment. *City of Boynton Beach v. Weiss*, 120 So. 2d 606, 610 (Fla. Dist. Ct. App. 2013). The City argues it is entitled to summary judgment as to the negligent supervision allegations because the officers were acting within the course and scope of their employment. Since it is undisputed that all officers were acting within the course and scope of their employment,[20] the City is entitled to summary judgment on Count IX. *See also Buckler v. Israel*, 680 F. App'x 831, 834 (11th Cir. 2017) (affirming summary judgment for defendant sheriff because there was no dispute that officers acted within course and scope of employment).

---

[20] Mr. Castro-Reyes somehow argues now that it is disputed whether the officers were acting within the course and scope of their employment, while simultaneously stating it is undisputed in his response to Defendant City of Opa-Locka's Statement of Material Facts. (DE 128 ¶ 33; DE 135 at 18.) Regardless of this inconsistency, the record is clear that Defendant Officers were responding to a 911 call in the course and scope of their duties.

### D. Fourteenth Amendment Allegations[21]

Defendants Perez and Serrano further argue that Mr. Castro-Reyes' Fourteenth Amendment allegations fail as a matter of law because all claims are properly analyzed under the Fourth Amendment. Mr. Castro-Reyes argues that summary judgment on the Fourteenth Amendment claims is not appropriate because the facts alleged sufficiently "shock the conscience" to support a Fourteenth Amendment violation. However, the law is clear that in the excessive force context, the Fourth Amendment covers arrestees and the Fourteenth Amendment covers pretrial detainees. *Crocker v. Beatty,* 995 F.3d 1232, 1245–46 (11th Cir. 2021). Because it is undisputed that Mr. Castro-Reyes falls in the former category, Mr. Castro-Reyes' excessive force Fourteenth Amendment claims fail as a matter of law.

## IV.    CONCLUSION

In sum, all Defendant Officers are entitled to summary judgment as to Count I, unlawful entry, and Count V, false imprisonment. Defendant City of Opa-Locka is entitled to summary judgment as to Count IX, negligent training and supervision.

As to Count II, false arrest, because there is a dispute as to whether probable cause existed to detain Mr. Castro-Reyes, summary judgment is not appropriate for Defendants Bosque and Kelly as the first officers on the scene. However, Defendants Serrano and Perez are entitled to summary judgment as to Count II as responding officers. Regarding Count III, excessive force, Defendants Bosque and Kelly are entitled

---

[21] Defendants Serrano and Perez moved for summary judgment on all of Mr. Castro-Reyes' Fourteenth Amendment Claims, but Mr. Castro-Reyes only addressed this issue in his response to Defendant Serrano. (DE 103 at 19–20; DE 108 at 17–18; DE 136; DE 137.)

to summary judgment. However, as to Defendants Serrano and Perez, there are genuine issues of material fact as to whether their conduct rises to the level of a constitutional violation.

As to Count IV, assault and battery, Defendants Bosque and Kelly are entitled to summary judgment. However, because there is a dispute as to whether Defendants Serrano and Perez acted with wanton or willful disregard, summary judgment is unavailable. Thus, summary judgment in favor of the City as to Count VII, assault and battery, is likewise inappropriate, as there is a dispute as to whether Defendants Serrano and Perez will be personally liable, or whether the City alone will shoulder liability. As to Count VIII, false imprisonment against the City, because there is a disputed issue as to whether Defendant Bosque had probable cause, summary judgment is improper.

Therefore, the Counts that will proceed to trial are as follows: Count II, false arrest against Defendants Bosque and Kelly; Count III, excessive force against Defendants Serrano and Perez; Count IV, assault and battery against Defendants Serrano and Perez; Count VI, municipal liability against the City only with regard to the false arrest claim against Defendant Bosque; Count VII, assault and battery against the City; and Count VIII, false imprisonment against the City.

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Plaintiff Mr. Castro-Reyes' Partial Motion for Summary Judgment (DE 109) is **DENIED**.

2. Defendant City of Opa-Locka's Motion for Summary Judgment (DE 99) is **GRANTED** as to Count IX and **DENIED** as to Counts VI, VII, and VIII.

3. Defendant Bosque and Kelly's Motion for Summary Judgment (DE 100) is

**GRANTED** as to Counts I, III, IV, and V and **DENIED** as to Count II.

4. Defendant Serrano's Motion for Summary Judgment (DE 103) is **GRANTED** as to Counts I, II, and V, and **DENIED** as to Counts III, IV.

5. Defendant Perez's Motion for Summary Judgment (DE 108) is **GRANTED** as to Counts I, II, and V, and **DENIED** as to Counts III and IV.

6. The stay in this matter is **LIFTED**.

7. The Parties are instructed to file a proposed scheduling order regarding any remaining pretrial deadlines and a proposed trial date **within fourteen (14) days of the date of this Order**.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 17th day of June, 2024.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE